# EXHIBIT 3

## Defendant YSA Investments 1, LLC's Motion to Stay All Claims

ELECTRONICALLY FILED
2026 May 18 AM 10:04
CLERK OF THE SEDGWICK COUNTY DISTRICT COURT
CASE NUMBER: SG-2026-CV-001216
PII COMPLIANT

**IN THE EIGHTEENTH JUDICIAL DISTRICT**
**DISTRICT COURT OF SEDGWICK COUNTY, KANSAS**
**CIVIL DIVISION**

| | | |
|---|---|---|
| RIVER WALK BEST LIVING LLC, a Delaware limited liability company<br><br>Plaintiff,<br><br>vs.<br><br>YSA INVESTMENTS 1, LLC, a Delaware Limited liability company,<br><br>Defendant. | ) | Case No. SG-2026-CV-1216 |

Proceeding under K.S.A. Chapter 60

**DEFENDANT YSA INVESTMENTS 1, LLC'S MOTION TO STAY ALL CLAIMS**

Defendant YSA Investments 1, LLC ("YSA") moves the Court to stay all claims in this case pending the resolution of the previously filed and closely related lawsuit in Delaware Chancery Court (the "Delaware Case"). Plaintiff was contacted regarding this motion and Plaintiff does not consent to a stay.

Staying this case would (1) allow the Delaware court to resolve the common and controlling issues of law—namely, whether this action's Plaintiff, River Walk Best Living LLC ("River Walk"), granted YSA a valid commercial power of attorney when its manager, Marc Kulick ("Kulick"), executed several loan agreements governed by Delaware law on behalf of River Walk and several other Kulick-controlled entities, and whether, in turn, YSA acted within the bounds of its delegated authority when it executed the mortgage at issue in this action pursuant to this power of attorney provision after the loan borrowers' default—, and (2) conserve judicial resources in Kansas by determining and providing guidance on the central issues in this lawsuit.



{1806994;}

River Walk will not be prejudiced by a stay because, on February 11, 2026, it was added to the Delaware Case as a third-party defendant, and it can assert the same claims in the Delaware Case that YSA was allegedly not authorized to execute the subject mortgage.

**INTRODUCTION**

This case, filed on April 2, 2026, involves a dispute that hinges on whether YSA was entitled to execute and file a mortgage on real property owned by River Walk (the "Mortgage"). *See* River Walk's Petition, ¶¶ 3-5, 13, 18-19. In River Walk's Petition, it alleges that:

- YSA signed the Mortgage "allegedly as attorney in fact for Marc Kulick;"
- YSA "was not authorized to sign the YSA Mortgage on River Walk's behalf;"
- The "Mortgage is void as it was executed without authority from River Walk or any River Walk agent having authority to mortgage River Walk's Property;"
- YSA slandered River Walk's title when "YSA created, published, and recorded the YSA Mortgage without privilege or justification," and "without any authority."

*Id.*, ¶¶ 4, 13, 18-19. All three of River Walk's claims in this lawsuit are based on the central premise that YSA had no authority to sign and record the Mortgage on River Walk's behalf. *See id.*, ¶¶ 8-21. This central premise is also the key, dispositive issue in the Delaware Case.

On November 13, 2025, 140 days before this case was filed, Kulick, Asset Holder, LLC ("Asset Holder"), and Vesta Holdings LLC ("Vesta") (collectively, the "Delaware Plaintiffs") brought the Delaware Case. Kulick has worn multiple hats in relation to his involvement with River Walk that will help to explain how we got here: (1) Kulick is the self-pronounced Chief Executive Officer of "Vesta Capital", a real estate investment firm that—through various Kulick-affiliated entities under Kulick's control, including those entities like River Walk Sponsor, LLC and Louis Investments, LLC that Plaintiff notes in its Petition—oversees a portfolio of properties

that has included River Walk until at least July 1, 2025[1]; (2) Kulick is the sole owner of Asset Holder and Vesta, a couple of the entities that sometimes represent Kulick's own beneficial ownership interest in a given real estate investment; and (3) with respect to River Walk, Kulick—directly, indirectly, or otherwise—seems to (i) have a substantial ultimate beneficial ownership interest in the property (through a series of entities) while failing to always specify every entity involved, (ii) have previously served as the underlying property's property manager, and (iii) through River Walk Sponsor LLC (as its 75% member, ostensibly through his entity, Louis Investments LLC), have previously been the manager of the limited liability company functioning as the holding company or investment fund for the River Walk investment. *See, e.g.* Verified Amended Complaint, *Kulick et al. v. YSA Investments 1, LLC et al.*, C.A. No. 2025-1319-KSJM (Del. Ch. Dec. 5, 2025) (the "Delaware Complaint"), ¶¶ 11, 16-17 attached hereto as **Exhibit 1**. The Delaware Case involves a dispute over whether YSA had the authority to execute various mortgages, including the Mortgage, pursuant to power of attorney clauses in Collateral Pledge and Security Agreements and Guaranties executed by Kulick on behalf of Asset Holder, Vesta, himself, and numerous other Kulick-controlled entities, including River Walk. *Id.* The Agreements and Guarantees are all governed by Delaware law. *Id.*, ¶ 2. In particular, the Delaware Plaintiffs allege that:

- YSA "recorded over two dozen second mortgages against real property . . . incorrectly premised on 'Power of Attorney' clauses in a security agreement and guaranty with Plaintiffs that, as a matter of law and fact, do not provide such rights;"
- YSA "has no right under Delaware law to exercise the Power of Attorney clauses in

---

[1] In its Petition, Plaintiff contends that River Walk Sponsor, LLC—ostensibly the entity through which Kulick has managed the investment vehicle that owns the River Walk property—resigned as River Walk's manager as of July 1, 2025. YSA disputes this allegation because Kulick continued to transact with YSA on behalf of River Walk beyond July 1, 2025.

this outrageous manner;"

- "The recording of these unauthorized mortgages—which far exceeds any rights YSA has under the Power of Attorney clauses or otherwise—***constitutes a slander of title***;"
- The "mortgages were recorded without right and in breach and violation of the Power of Attorney clauses, are void, of no legal effect, and not enforceable against the Properties;" and
- "Nor did the Defendant have apparent authority on behalf of the principals for purposes of the Second Mortgages…"

Delaware Complaint, ¶¶ 2-3, 23, 32, 36, 40-42, 45 (emphasis added). On February 11, 2026, YSA filed its Amended Answer and Verified Counterclaims and Third-Party Complaint ("Answer and Third-Party Complaint") in which River Walk was named as a Third-Party Defendant. *See* Answer and Third-Party Complaint, *Kulick et al. v. YSA Investments 1, LLC et al*, C.A. No. 2025-1319-KSJM (Del. Ch. Feb. 11, 2025), attached hereto as **Exhibit 2**. Thus, every party to this lawsuit is also a party to the Delaware Case.

Because this case between parties to the Delaware Case involves the same controlling legal issue—whether YSA had actual or apparent authority to execute and record the Mortgage pursuant to the power of attorney clause governed by Delaware law—the Court should conserve judicial resources and stay this case until the Delaware court is able to resolve the unique question of Delaware law that will facilitate the resolution of this case. Simply put, the issues that will decide the merits here are already being litigated in the Delaware Case.

## DISCUSSION

### I. Courts Have Discretion to Stay Cases Based on an Earlier Lawsuit That Will Aid In Resolving Issues in the Latter Case.

A court's "'power to stay proceedings is incidental to the power inherent in every court to control the disposition of the cases on its docket with economy of time and effort for itself, for



{1806994;}

counsel, and for litigants.'" *Harsch v. Miller*, 288 Kan. 280, 292–93, 200 P.3d 467, 475 (2009) (quoting *Landis v. North American Co.*, 299 U.S. 248, 254 (1936)). The determination of whether to grant a stay is "largely discretionary with the court." *Henry v. Stewart*, 203 Kan. 289, 293, 454 P.2d 7, 11 (1969). There are various bases to stay a case and those bases "vary according to the requirements of the particular case in which a stay is sought." *Id.*

Kansas courts have repeatedly found a stay was warranted based on a prior case that will be determinative of, or helpful to deciding, all or some of the issues in the latter case. *Id.*, 203 Kan. at 295, 454 P.2d at 12 (holding it was not an abuse of discretion for a state court to stay the case pending a federal lawsuit involving the same issues and parties); *Turner v. Steele*, 47 Kan. App. 2d 976, 993, 282 P.3d 632, 643 (2012) (holding it was an abuse of discretion to refuse to stay a sheriff's sale pending the resolution of a quiet title action); *State v. Davies Oil Co., Inc.*, 02 CR 823, 2002 WL 32136262, at *8 (Kan. Dist. Ct. Aug. 27, 2002) (staying the case based on a failure to pay taxes pending the federal case that would be helpful on the issue of tribal sovereignty).

In *Henry*, the Kansas Supreme Court outlined an instructive list of "the determinative factors" for deciding whether to stay a state court case based upon a concurrent federal case:

1. "whether the action in the federal court was commenced prior to the state court proceeding;"
2. "whether the federal adjudication affects the outcome of the state court action;"
3. "whether the parties, causes of action, and issues in the two actions are the same;"
4. "whether it is more convenient for the parties to conduct the litigation in one forum rather than in the other;"
5. "whether the question was one of federal law, as to which the federal courts have special knowledge and expertise;"
6. "whether the federal court was likely to entertain the action; and"
7. "whether the federal action was brought in good faith."

203 Kan. at 293, 454 P.2d at 11. While *Henry* involved an earlier *federal* case, the factors are still

instructive as to how a Kansas case would analyze the current situation. The applicability of the *Henry* factors is further solidified by the fact that the Kansas Court of Appeals determined that the principals of comity on which *Henry* relied also apply when there are two Kansas state court cases at issue. *Turner*, 47 Kan. App. 2d at 991, 282 P.3d at 642.

## II. This Case Should Be Stayed to Allow the Central Issue—an Esoteric Question of Delaware Law—to be Resolved in the Prior Delaware Case

Because the determinative factors espoused by *Henry* weigh in favor of staying this case, the Court should exercise its discretion to stay the case and allow the Delaware court to resolve the common, controlling issue of whether YSA had authority to execute the Mortgage under Delaware law.

It cannot be disputed that the first, sixth and seventh factors from *Henry* weigh in favor of staying the case because the Delaware Case was filed before this lawsuit, the Delaware court is and will continue to entertain the action, and the Delaware Case was brought in good faith. Relatedly, it is more convenient for River Walk and YSA to solve the nuanced question of Delaware law that impacts a host of mortgages in a single lawsuit in Delaware, where both are parties, rather than litigating the issue piecemeal in a multitude of lawsuits for each individual mortgage. Thus, the fourth *Henry* factor also weighs in favor of staying this case.

This lawsuit and the Delaware Case involve the same issue of whether YSA had authority to create and sign the mortgage on behalf of Kulich's entity. In the Delaware Case, Plaintiffs allege that YSA "unlawfully recorded over two dozen second mortgages against real property" and "[t]he recording of these unauthorized mortgages—which far exceeds any rights YSA has under the Power of Attorney clauses or otherwise—constitutes a slander of title." Ex. 1, Delaware Complaint, ¶¶ 2-3. In this case, Plaintiff brings a claim for slander of title based on essentially the

same argument that "Diveroli was not authorized to sign the YSA Mortgage on River Walk's behalf." River Walk's Petition, ¶¶ 5, 13, 18-19. Because the cases involve the same dispositive issue of whether YSA had authority under the power of attorney clauses to execute mortgages, which Kulick and YSA has been disputing and litigating about in Delaware since last year, there is no question that the resolution of that issue in the Delaware case will impact (if not control) the resolution of this case and provide helpful guidance to this Court on a specialized question of Delaware law. *See Henry*, 203 Kan. at 293-95, 454 P.2d at 11-12 (granting a stay because the earlier case "will be determinative of the issues in the" latter action); *Davies Oil Co., Inc.*, 02 CR 823, 2002 WL 32136262, at *8 (granting a stay because it was "likely that the decision in federal court will be helpful in bringing this criminal action to a conclusion"). Therefore, the second and third *Henry* factors also weigh strongly in favor of staying this case.

Finally, factor five weighs in favor of staying the case because the main issue is a "question . . . of [Delaware] law, as to which the [Delaware] courts have special knowledge and expertise." *Henry*, 203 Kan. at 293, 454 P.2d at 11. The agreements containing the power of attorney clauses pursuant to which YSA executed the Mortgage are all governed by Delaware law. Similar to *Davies Oil Co. Inc.*, the Delaware court considering the earlier case has special expertise in considering whether YSA had a "right under Delaware law to exercise the Power of Attorney clauses." Ex. 1, Delaware Complaint, ¶ 2; *see also* 02 CR 823, 2002 WL 32136262, at *8 (relying on "the federal court's expertise in issues involving tribal sovereignty"). The Delaware court's expertise is especially important in this case because the determination of whether, under Delaware law, YSA has the power to execute mortgages based on the specific terms of the power of attorney clauses is a novel legal issue.

Therefore, this case should be stayed so the Delaware court can determine whether YSA

had the authority, under Delaware law, to execute the mortgages pursuant to the power of attorney clauses. Otherwise, YSA is exposed to the risk of contradictory rulings on the same legal issues.

## CONCLUSION

There are two related cases that both hinge on the same legal issue of whether YSA had authority to execute mortgages pursuant to power of attorney clauses under Delaware law: an earlier case filed in Delaware by the individual and his entities that control River Walk and granted the power of attorney to YSA, and this case filed almost five months after the Delaware case. Because the Delaware court is uniquely suited to resolve the specialized question of Delaware law, and its resolution of this issue will be helpful in bringing this case to a conclusion, this Court should conserve judicial resources and stay the case until the Delaware court determines whether YSA had authority to execute the Mortgage.

Dated this 15th day of May, 2026.

Respectfully submitted,


*/Todd A. Nelson/*
Todd A. Nelson, No. 16028
GABLEGOTWALS
110 N. Elgin, Ste. 200
Tulsa, Oklahoma 74120
Telephone: (918) 595-4800
Facsimile: (918) 595-4990
E-Mail: *tnelson@gablelaw.com*

*Admitted Pro Hac Vice:*
David P. Limekiller, OBA No. 18173
GABLEGOTWALS
110 North Elgin Avenue, Suite 200
Tulsa, Oklahoma 74120-1495
Telephone: (918) 595-4800
Facsimile: (918) 595-4990
E-mail: dlimekiller@gablelaw.com

Attorneys for Defendant YSA Investments 1, LLC

## CERTIFICATE OF SERVICE

I certify that the foregoing Motion to Stay All Claims was served, via electronic mail, on this 15th day of May, 2026 to the following:

Nanette Turner Kalcik
Stinson LLP
1625 N. Waterfront Parkway
Suite 300
Wichita, Kansas 67206

*/Todd A. Nelson/*
Todd A. Nelson

ELECTRONICALLY FILED
2026 May 18 AM 10:04
CLERK OF THE SEDGWICK COUNTY DISTRICT COURT
CASE NUMBER: SG-2026-CV-001216
PII COMPLIANT

**IN THE EIGHTEENTH JUDICIAL DISTRICT**
**DISTRICT COURT OF SEDGWICK COUNTY, KANSAS**
**CIVIL DIVISION**

| | | |
|---|---|---|
| RIVER WALK BEST LIVING LLC, a Delaware limited liability company<br><br>Plaintiff,<br><br>vs.<br><br>YSA INVESTMENTS 1, LLC, a Delaware Limited liability company,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. SG-2026-CV-1216 |

Proceeding under K.S.A. Chapter 60

# EXHIBIT 1

EFiled: Dec 05 2025 11:46AM EST
Transaction ID 77931892
Case No. 2025-1319-MTZ

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

MARC KULIC, VESTA HOLDINGS, LLC, and ASSET HOLDER, LLC,

C.A. NO.: 2025-1319-MTZ

Plaintiffs,

vs.

YSA INVESTMENTS 1, LLC,

Defendant.

______________________________/

**VERIFIED AMENDED COMPLAINT**

1. Plaintiffs Marc Kulick ("Kulick"), Vesta Holdings, LLC ("Vesta Holdings"), and Asset Holder, LLC ("Asset Holder") (collectively, "Plaintiffs") file this Complaint against Defendant YSA Investments 1, LLC ("Defendant") for equitable and declaratory relief.

2. Defendant, a hard money lender led by a notorious felon, has unlawfully recorded over two dozen second mortgages against real property, attached hereto as Exhibit A, as part of an extortive scheme to extract unearned fees and interest from Plaintiffs. Defendant's recording of these second mortgages, including a second mortgage on Kulick's personal residence, is incorrectly premised on "Power of Attorney" clauses in a security agreement and guaranty with Plaintiffs that, as a matter of law and fact, do not provide such rights. Defendant is not in any



EXHIBIT 1

contractual privity whatsoever with the title owners of these properties and has no right under Delaware law to exercise the Power of Attorney clauses in this outrageous manner. To tighten the noose, Defendant is demanding an eye-popping $900 million payoff to satisfy its debt and release its mortgages. To put this absurd, extortionate number into context, Defendant has made $7 million worth of loans over the last year and has been paid back $8 million. In truth, Defendant does not want to be paid off—it wants to squeeze Plaintiffs into submission.

3. The recording of these unauthorized mortgages—which far exceeds any rights Defendant has under the Power of Attorney clauses or otherwise—constitutes a slander of title, threatens a default under the institutional first mortgages given by the title owners, exposes Plaintiffs to an enormous and unjustified amount of liability, and creates an inability to alienate property that is causing them ongoing and irreparable injury, justifying expedited action by this Court. In fact, the second mortgages have already scuttled a closing on one property and threaten do so on several other properties in the immediate future.

## PARTIES, JURISDICTION, & VENUE

4. Marc Kulick is an individual residing in Oklahoma.

5. Vesta Holdings, LLC is an Oklahoma limited liability company formed and organized under the laws of Oklahoma.

6. Asset Holder, LLC is an Oklahoma limited liability company formed and organized under the laws of Oklahoma.

7. YSA Investments 1, LLC is a Delaware limited liability company formed and organized under the laws of Delaware.

8. This Court has subject matter jurisdiction pursuant to 10 Del. C. § 341 and § 6501, as Plaintiffs seek equitable and declaratory relief including a mandatory injunction to cancel or otherwise rescind the slanderous mortgages.

9. Further, jurisdiction and venue are proper because the "Power of Attorney" clauses relied upon by Defendant to record the mortgages are contained in a Collateral Pledge and Security Agreement ("CPSA") and Guaranty that select the State of Delaware as the governing forum for all disputes arising thereunder.

10. Defendant agreed in the loan documents that, in the event of its gross negligence or willful misconduct, Plaintiffs would be entitled to issuance of an injunction and their irreparable harm would be presumed.

## GENERAL ALLEGATIONS

11. Kulick is an individual residing in Oklahoma. Kulick is the founder, Chief Executive Officer, and principal of Vesta Holdings and Asset Holder. Kulick is also the founder and Chief Executive Officer of Vesta Capital, LLC and Vesta Realty, LLC. Vesta Capital, LLC is a fully integrated real estate investment firm specializing in the acquisition and renovation of multifamily communities across

Arkansas, Kansas, and Oklahoma. Vesta Realty, LLC is a wholly owned subsidiary of Vesta Capital and is a property management company that ensures operational control and real-time monitoring of Vesta Capital's property.

12. Defendant is a hard money lender based out of Miami, Florida, and led by a notorious felon, Efraim Diveroli, who was convicted for conspiring to defraud the United States government out of hundreds of millions of dollars by misrepresenting the source of arms and ammunition.

13. Pursuant to the needs of the Vesta entities, starting in October 2024, Plaintiffs and other entities owned and controlled by Kulick entered several loan transactions with Defendant. The interest rates on these loans started at an extremely high annual rate of 100% and spiraled into ever excessive rates, topping out at an eye-popping and exploitative 7,000% per annum in July 2025.

14. In total, Kulick and his entities borrowed $7,338,166.66 in principal from Defendant. Kulick and his entities have repaid Defendant $8,188,750.00.

15. As part of the loan transactions, Kulick's entities, including the other Plaintiffs Vesta Holdings and Asset Holder, executed Collateral Pledge and Security Agreements in favor of Defendant, all of which are essentially identical. Additionally, Kulick executed a Guaranty and ROFO (Right of First Offer) for each of the transactions, all of which were also essentially identical.

16. The Collateral Pledge and Security Agreements (the "February CPSA," attached hereto as Exhibit B) and Guaranty and ROFO (the "February Guaranty," attached hereto as Exhibit C) upon which Defendant purports to rely on in recording the Second Mortgages are from a loan transaction made as of February 18, 2025. To secure repayment of the loan, the February CPSA collateralized the limited liability company interests held by Asset Holder and Vesta Holdings in seventeen Delaware limited liability companies: Capitol on 28th Investors, LLC; Remington Ranch Investors, LLC; Copperfield Investors, LLC; Putnam Investors, LLC; Woodscape Investors, LLC; Barcelona Best Living, LLC; Riverpark Best Living Investors, LLC; Montgomery Vesta Investors, LLC; Fairfax Holding Company, LLC; OKC3 Investors, LLC; Eton Investor, LLC; Eaton Place Investors, LLC; W.O. Holding Co., LLC; Regency Holdings, LLC; Woodland Manor Holdings, LLC; 727-Classes Best Living Investors, LLC; and Muntage Vesta Investors, LLC (the "Intermediate Holding LLCs").

17. The Intermediate Holding LLCs have fractional beneficial interests in some but not all the Title Owners, which are defined below. All but one of the Intermediate Holding LLCs, Barcelona Best Living, LLC, hold their beneficial interests in a Title Owner through one or more additional levels of holding companies.

18. The February CPSA contains a Power of Attorney clause at Section 4.6, which provides as follows:

> [Asset Holder] and [Vesta Holdings] each appoint [Defendant] as its/his/her/their attorney-in-fact with full power in [Asset Holder's] and [Vesta Holdings'] name and behalf to do every act that [Asset Holder] and [Vesta Holdings] are obligated to do or may be required to do hereunder or to do all other things which [Defendant] is permitted to do under this Agreement or any other Loan Documents or are necessary to carry out this Agreement or the other Loan Documents; however, nothing in this section shall be construed to obligate [Defendant] to take any action hereunder. Through exercise of this irrevocable power of attorney, [Defendant] may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to [Defendant]. This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither [Defendant] nor any of its officers, managers, employees or agents of [Defendant] will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, [Defendant] shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

19. The February CPSA also contains a Joinder, titled "Joinder of Borrowed-Affiliated Entities," which provides:

> The undersigned [Kulick], as manager, member or other authorized person of any and all Guarantor Entities and any other entities [] which the undersigned does now own or control or may herein after own or control during the term of that certain [CPSA] hereby agrees to jointly and severally assume all obligations of Pledgor under the [CPSA] for all purposes thereof on the terms set forth therein and to be bound by

the terms as fully as if the undersigned has personally and individually executed and delivered the [CPSA] as of the date thereof.

20. The February Guaranty also contains a Power of Attorney clause at Section 7.h, which provides as follows:

[Kulick] appoints [Defendant] as its/his/her attorney-in-fact with full power in [Kulick]'s name and behalf to do every act that [Kulick]is obligated to do or may be required to do hereunder; however, nothing in this section shall be construed to obligate [Defendant]to take any action hereunder. The power of attorney hereby created is a power coupled with an interest and shall be irrevocable. Through exercise of this irrevocable power of attorney, [Defendant]may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to [Defendant]. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither [Defendant]nor any of its officers, managers, employees or agents of [Defendant] will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, [Defendant] shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

21. On October 31, 2025, Defendant recorded second mortgages against at least twenty-five properties. *See* Exhibit A.

22. The properties (hereafter "Properties") at issue in this case are multifamily apartment complexes located in Oklahoma and Kansas and owned by A-V 23 East Owner, LLC; 727 Lofts Best Living LLC; Barcelona Best Living LLC; Bryan Hill's Best Living LLC; TRDWind Capitol LLC; A-V Classen Owner LLC; Copperfield Apartments LP; Fairfax Best Living LLC; Lakeside Best Living LLC; Bartlesville Best Living LLC; Lofts at North Penn Best Living LLC; Montgomery

Best Living LLC; Muntage Best Living LLC; One Eton Square LLC; Ridge Best Living LLC; Riverpark Best Living LLC; Shoreline's Best Living LLC; Springdale Village's Best Living, LLC; Summer Oaks Best Living, LLC; Ridge Best Living LLC; Jenk's Best Living LLC; A-V Village Creek Owner LLC; Villas at Midtown Best Living LLC; Woodland Manor's Best Living LLC; Woodland Oaks Best Living LLC; B & J Woodscape/Oklahoma City LLC; and Easton Best Living, LLC (together the "Title Owners").

23. Even though the Title Owners, not Plaintiffs, are their owners, Defendant has purported to record these second mortgages against the Properties under the Power of Attorney clauses that, on their face, do not and cannot confer authority to mortgage the real property discussed herein.

24. Defendant also recorded a mortgage against Kulick's personal residence in Oklahoma City, Oklahoma even though the Guaranty he signed provides Defendant no such rights. A copy of the recorded mortgage against Kulick's personal residence is attached hereto as Exhibit D.

25. Following the recording of those second mortgages, on November 5, 2025, Defendant brought a civil action against Kulick and others, alleging breach-of-contract and unjust enrichment with respect to four of the loan transactions referenced herein. The civil action is *YSA Investments 1, LLC v. Marc Kulick, et al.*, Case No. N25C-10-309 KMM (Del. Super. Ct.).

26. Before and since the filing of that suit, Defendant, through Diveroli, has engaged in what can only be described as an extortion scheme. This includes, but is not limited to, threatening to file an Amended Complaint that would allege fraud against Mr. Kulick's wife, business partner, and even his attorneys (for providing advice to their client). Defendant has also threatened to send preservation letters to entities and persons for which it has no reason to believe has relevant information in this suit, including, for example, Mr. Kulick's personal rabbi. Such preservation notices would serve no other purpose than to embarrass and humiliate Mr. Kulick in the communities in which he belongs.

27. The alternative Defendant, through Diveroli, has provided Plaintiffs is perhaps even worse than its threats. Notwithstanding that it has been repaid its principal in full and more, Defendant has only offered to dismiss its suit and not proceed with its extortion scheme in exchange for payment of $20 million with the extreme default penalty of deeds-in-lieu of foreclosure for each of the Properties (which Plaintiffs are powerless to provide) and a confession of judgment of $850 million. In the meantime, while waiting to be paid its extortive settlement, Defendant would maintain the unlawful second mortgages on the properties owed by the Title Owners and file additional second mortgages.

28. On December 2, 2025, Defendant informed Plaintiffs that it would "limit" the amount owed to approximately $900 million dollars, despite having lent only $7 million over the last year and having received $8 million in repayments.

29. Defendant's extortion scheme is already causing significant harm. Muntage Best Living LLC was under contract with Greenlite Holdings, LLC to sell the real property it owns. However, because the title underwriter indicated that the transaction would not be able to close absent satisfaction of Defendant's unlawful second mortgage, that transaction was unable to close.

30. Making this situation further intolerable for Plaintiffs is Defendant's $900 million payoff demand, an extortive and criminally usurious amount that prevents Plaintiffs from satisfying the illegitimate second mortgages.

31. As part of extracting themselves from what can only be characterized as a loan sharking scheme, Plaintiffs have been forced to file this suit for a declaratory judgment that the second mortgages are unlawful and unauthorized and for a mandatory injunction that they be cancelled or rescinded from the public records.

32. This relief must be granted for several reasons. *First*, Defendant does not have any rights, secured or otherwise, with respect to the Title Owners or the Properties. The Power of Attorney under the February CPSA, which Defendant contends gives it the right to record the second mortgages, appoints Defendant as

Plaintiffs' attorney-in-fact with respect to the "Collateral"—i.e., Asset Holder and Vesta Holdings' limited liability company interests in the Intermediate Holding LLCs. As the attorney-in-fact, Defendant is permitted to take "any action against any of the Collateral or any real or personal property owned by the Collateral."

33. The Collateral—Asset Holder and Vesta Holding's limited liability company interests in the Intermediate Holding LLCs—does not own the Properties. Indeed, the membership interests do not own anything. Some of the Title Owners—A-V 23 East Owner LLC, Lakeside Best Living LLC, Bartlesville Best Living LLC, Lofts at North Penn Best Living LLC, Shoreline's Best Living LLC, Ridge Best Living LLC, THRIVE Argenta Owner LLC, Jenk's Best Living LLC, A-V Village Creek Owner LLC, and Villas at Midtown Best Living, LLC—are not owned by any of the Intermediate Holding LLCs and do not otherwise have any connection to them. And even if the collateralized limited liability company interests could be stretched to encompass the entirety of the Intermediate Holding LLCs themselves, these entities own, only indirectly, a fractional interest in some of the Title Owners, which in turn own the Properties. Yet Defendant has recorded the second mortgages against the Properties owned by the Title Owners with which Defendant has no contractual privity and against which Defendant has no rights whatsoever. The Power of Attorney clause in the February Guaranty is narrower than the one

contained in the February CPSA and similarly provides no rights to Defendant with respect to Title Owners, the Properties, or to Kulick's personal residence.

34. The Joinder does not alter this analysis. The Joinder extends the Power of Attorney clauses to entities which Kulick individually owns or controls. But Kulick does not individually own or control any of the Title Owners such that the Joinder would give Defendant any rights to mortgage their properties. And even if the import of the Joinder was to make every Title Owner and holding company a Pledgor under the February CPSA, the Joinder, at most, provides Defendant with a secured interest in the Title Owners' limited liability company interests, which does not translate to a right to a secured interest in the Title Owners' assets. Under the CPSA, the "Collateral" in which Defendant has a security interest are limited liability company interests owned by the Pledgors. (Ex. B, CPSA § 1.1(a).) The limited liability company interests owned by the Pledgors (including, *arguendo*, those of the Title Owners) do not own the Properties or have any cognizable rights to the entities' assets under 6 Del. C. § 18-701.

35. *Second*, even if the Power of Attorney clauses could be stretched so far as to include rights held by the Title Owners, under 6 Del. Code § 18-702(a), those rights necessarily would not include the control rights necessary to record the Second Mortgages on the Properties. This is because control rights inherent in a limited liability company interest may not be assigned absent a provision in the operating

agreement of that limited liability company permitting such an assignment or, alternatively, an affirmative vote or written consent of all members of the LLC permitting such an assignment. None of the operating agreements of the Intermediate Holding LLCs or the Title Owners contain such a right, and Defendant did not receive an affirmative vote or written consent of all members of any of the entities permitting such an assignment. Therefore, the Power of Attorney clause that purports to give Defendant rights to take actions on behalf of the collateralized "membership interests" in the Properties is of no legal effect.

36. *Third*, taking it even further, even if Defendant were to receive such control rights through Kulick, Asset Holder, and/or Vesta Holdings, none of their control rights contain the right to unilaterally mortgage the Properties held by the Title Owners. As attorney-in-fact, Defendant's rights can extend no further than those held by the principal for which it has been appointed an agent. Nor did Defendant have the apparent authority on behalf of the principals for purposes of the Second Mortgages (i.e., the Title Owners), as the Title Owners never manifested Kulick's authority to permit Defendant to record the second mortgages.

37. Defendant's recording of these second mortgages was therefore made without any authority, in violation of the loan documents, and plainly unlawful.

38. Defendant's recording of the second mortgages has harmed Plaintiffs' indirect economic interest in the Properties and has exposed them to vast potential liability as manager and/or operator of the Properties.

**COUNT I: DECLATORY JUDGMENT**

39. Plaintiffs re-allege and incorporate by reference the allegations preceding the first count of this complaint as if fully set forth herein.

40. An actual controversy exists between Plaintiffs and Defendant regarding the validity of the second mortgages. This controversy is real, adverse and ripe for judicial determination.

41. Defendant contends that it was within its rights to record the second mortgages while Plaintiff contends that this recording was unlawful, a breach of and gross overextension of the Power of Attorney clauses, part of an extortive scheme and that the second mortgages are invalid and should be cancelled or extinguished.

42. Therefore, Plaintiffs are entitled to a declaration that the second mortgages were recorded without right and in breach and violation of the Power of Attorney clauses, are void, of no legal effect, and not enforceable against the Properties.

43. Plaintiffs re-allege and incorporate by reference the allegations preceding the first count of this complaint as if fully set forth herein.

44. The second mortgages on the Properties, even though invalid, remain of record and are causing irreparable harm to Plaintiffs.

45. Defendant's recording of the second mortgages was unlawful, a breach of and gross overextension of the Power of Attorney clauses, and part of an extortive scheme.

46. Defendant's recording of the second mortgages has scuttled the closing of one real estate transaction and threaten to obstruct many more. The second mortgages have caused, and will continue to cause, significant financial harm to Plaintiffs.

47. However, monetary damages alone will not cure Plaintiffs' harm because monetary remedies would not serve to remove the second mortgages from the public record. The second mortgages have clouded the Properties' title and have impacted the ability to alienate the Properties in the ordinary course of business.

48. Plaintiffs have no adequate remedy at law and are therefore entitled to a preliminary and permanent injunction directing Defendant to immediately execute and record withdrawals, cancellations, or releases of the invalid second mortgage.

**PRAYER FOR RELIEF**

Accordingly, Plaintiffs respectfully request that this Court enter judgment against Defendants in Plaintiffs' favor awarding the declaratory and injunctive relief

requested herein, monetary damages, and any other relief the Court deems just and proper.

Dated: December 5, 2025

Respectfully submitted,

*/s/ Sean J. Bellew*
Sean J. Bellew (#4072)
BELLEW LLC
2961 Centerville Road, Suite 302
Wilmington, DE 19808
Telephone: (610) 585-5900

*Counsel for Plaintiffs*

Of Counsel
Benjamin H. Brodsky, Esq.,
(admitted *pro hac vice*)
Michael Fisher, Esq.,
BRODSKY FOTIU-WOJTOWICZ, PLLC
(admitted *pro hac vice*)
*Counsel for Plaintiffs*
200 SE 1st Street, Suite 400
Miami, Florida 33131
Tel: 305-503-5054

ELECTRONICALLY FILED
2026 May 18 AM 10:04
CLERK OF THE SEDGWICK COUNTY DISTRICT COURT
CASE NUMBER: SG-2026-CV-001216
PII COMPLIANT

**IN THE EIGHTEENTH JUDICIAL DISTRICT**
**DISTRICT COURT OF SEDGWICK COUNTY, KANSAS**
**CIVIL DIVISION**

| | | |
|---|---|---|
| RIVER WALK BEST LIVING LLC, a Delaware limited liability company | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. SG-2026-CV-1216 |
| YSA INVESTMENTS 1, LLC, a Delaware Limited liability company, | ) | |
| Defendant. | ) | |

Proceeding under K.S.A. Chapter 60

# EXHIBIT 2

EFiled: Feb 11 2026 04:40PM EST
Transaction ID 78449646
Case No. 2025-1319-KSJM

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MARC KULICK, VESTA HOLDINGS, LLC, and ASSET HOLDER, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>YSA INVESTMENTS 1, LLC,<br><br>Defendant, | C.A. No. 2025-1319-KSJM |
| YSA INVESTMENTS 1, LLC,<br><br>Counterclaimant and Third-Party Plaintiff,<br><br>v.<br><br>MARC KULICK, VESTA HOLDINGS LLC, BARTLESVILLE BEST LIVING, LLC; SHORELINE'S BEST LIVING, LLC; SPRINGDALE VILLAGE TIC 1 LLC; SPRINGDALE VILLAGE TIC 2, LLC; SPRINGDALE VILLAGE TIC 3, LLC; SPRINGDALE VILLAGE'S BEST LIVING, LLC; A-V 23 EAST OWNERS, LLC; A-V CLASSEN OWNER, LLC; A-V VILLAGE CREEK OWNER, LLC; AUERBACH-VESTA, LLC; BARCELONA BEST LIVING, LLC; BRYAN HILLS BEST LIVING, LLC; EATON PLACE TIC 1 LLC; FAIRFAX HOLDING COMPANY, LLC; LAKESIDE BEST LIVING LLC; LOFTS AT NORTH PENN BEST LIVING LLC;; MONTGOMERY APARTMENT HOLDINGS, LLC; MONTGOMERY BEST LIVING, LLC; MUNTAGE BEST LIVING, | |

LLC; NAE CANOPY APARTMENTS, LLC; OKC3 INVESTORS LLC; ONE ETON TIC 1 LLC; REMINGTON RANCH BEST LIVING LLC; RIDGE BEST LIVING INVESTORS LLC; RIDGE BEST LIVING, LLC; RIVER WALK BEST LIVING, LLC; RIVERPARK BEST LIVING, LLC; SUMMER OAKS BEST LIVING LLC; TUSCANY VILLAGE BEST LIVING LLC; VESTA-SEMINOLE RIDGE LLC; VILLAS AT MIDTOWN BEST LIVING LLC; W.M. BEST LIVING OWNER, LLC; W.O. SOLE MEMBER LLC; WOODLAND OAKS BEST LIVING LLC; JENKS BEST LIVING LLC; LOUIS INVESTMENTS LLC; LS APARTMENT SPONSOR LLC; RIVER WALK SPONSOR LLC; RIVERPARK BEST LIVING INVESTORS, LLC; SEMINOLE RIDGE APARTMENTS HOLDINGS LLC; SEMINOLE RIDGE SPONSOR LLC; TUSCANY VILLAGE SPONSOR LLC; VESTA HOLDINGS, LLC; 206 QUEEN ANNE CLUB LLC; B&J WOODSCAPE / OKLAHOMA CITY, LLC; AND COPPERFIELD APARTMENTS, LP, and related entities, identified presently as DOES 1-100 and ROES 1-100,

Counterdefendants and
Third-Party Defendants.

**YSA INVESTMENT LLC'S AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO VERIFIED AMENDED COMPLAINT AND VERIFIED COUNTERCLAIMS AND THIRD-PARTY COMPLAINT**

YSA Investments 1, LLC's ("YSA"), by and through its undersigned counsel, hereby answers the allegations contained in the Verified Amended Complaint (the



EXHIBIT 2

"Complaint") of plaintiffs Marc Kulick, Vesta Holdings, LLC, and Asset Holder, LLC (collectively "Plaintiffs").

Defendant is not responding to the headings in the Complaint; to the extent a response is required, any allegations contained in the headings are denied. The Prayer for Relief in the Complaint does not contain allegations of fact and is therefore omitted from this Answer. Unless expressly admitted, all allegations contained in the Complaint are denied. YSA reserves the right to amend and/or supplement this Answer.

PARAGRAPH NO. 1:

> Plaintiffs Marc Kulick ("Kulick"), Vesta Holdings, LLC ("Vesta Holdings"), and Asset Holder, LLC ("Asset Holder") (collectively, "Plaintiffs") file this Complaint against YSA Investments 1, LLC ("Defendant") for equitable and declaratory relief.

RESPONSE TO PARAGRAPH NO. 1:

Admitted.

PARAGRAPH NO. 2:

> YSA, a hard money lender led by a notorious felon, has unlawfully recorded over two dozen second mortgages against real property, attached hereto as Exhibit A, as part of an extortive scheme to extract unearned fees and interest from Plaintiffs. YSA's recording of these second mortgages, including a second mortgage on Kulick's personal residence, is incorrectly premised on "Power of Attorney" clauses in a security agreement and guaranty with Plaintiffs that, as a matter of law and fact, do not provide such rights. YSA is not in any contractual privity whatsoever with the title owners of these properties and has no right under Delaware law to exercise the Power of Attorney clauses in this outrageous manner. To tighten the noose, YSA is demanding an eye-popping $900 million payoff to satisfy its debt and release its mortgages. To put this absurd,

extortionate number into context, YSA has made $7 million worth of loans over the last year and has been paid back $8 million. In truth, YSA does not want to be paid off—it wants to squeeze Plaintiffs into submission.

RESPONSE TO PARAGRAPH NO. 2:

YSA admits that it made hard money loans to Plaintiffs. YSA denies all other allegations contained herein.

PARAGRAPH NO. 3:

The recording of these unauthorized mortgages—which far exceeds any rights YSA has under the Power of Attorney clauses or otherwise—constitutes a slander of title, threatens a default under the institutional first mortgages given by the title owners, exposes Plaintiffs to an enormous and unjustified amount of liability, and creates an inability to alienate property that is causing them ongoing and irreparable injury, justifying expedited action by this Court. In fact, the second mortgages have already scuttled a closing on one property and threaten do so on several other properties in the immediate future.

RESPONSE TO PARAGRAPH NO. 3:

Denied.

## PARTIES, JURISDICTION, & VENUE

PARAGRAPH NO. 4:

Marc Kulick is an individual residing in Oklahoma.

RESPONSE TO PARAGRAPH NO. 4:

YSA lacks information sufficient to admit or deny the allegations in this paragraph and on that basis denies the same.

PARAGRAPH NO. 5:

Vesta Holdings, LLC is an Oklahoma limited liability company formed and

organized under the laws of Oklahoma.

RESPONSE TO PARAGRAPH NO. 5:

YSA lacks information sufficient to admit or deny the allegations in this paragraph and on that basis denies the same.

PARAGRAPH NO. 6:

Asset Holder, LLC is an Oklahoma limited liability company formed and organized under the laws of Oklahoma.

RESPONSE TO PARAGRAPH NO. 6:

YSA lacks information sufficient to admit or deny the allegations in this paragraph and on that basis denies the same.

PARAGRAPH NO. 7:

YSA Investments 1, LLC is a Delaware limited liability company formed and organized under the laws of Delaware.

RESPONSE TO PARAGRAPH NO. 7:

Admitted.

PARAGRAPH NO. 8:

This Court has subject matter jurisdiction pursuant to 10 Del. C. § 341 and § 6501, as Plaintiffs seek equitable and declaratory relief including a mandatory injunction to cancel or otherwise rescind the slanderous mortgages.

RESPONSE TO PARAGRAPH NO. 8:

Denied.

PARAGRAPH NO. 9:

> Further, jurisdiction and venue are proper because the "Power of Attorney" clauses relied upon by YSA to record the mortgages are contained in a Collateral Pledge and Security Agreement ("CPSA") and Guaranty that select the State of Delaware as the governing forum for all disputes arising thereunder.

RESPONSE TO PARAGRAPH NO. 9:

YSA admits that the loan documents include a forum selection clause and a Power of Attorney, and respectfully refers the Court to the loan documents for a complete and accurate description of its contents.

PARAGRAPH NO. 10:

> YSA agreed in the loan documents that, in the event of its gross negligence or willful misconduct, Plaintiffs would be entitled to issuance of an injunction and their irreparable harm would be presumed.

RESPONSE TO PARAGRAPH NO. 10:

YSA admits that remedies are provided for in the loan documents and respectfully refers the Court to those documents for a complete and accurate description of their contents.

## GENERAL ALLEGATIONS

PARAGRAPH NO. 11:

> Kulick is an individual residing in Oklahoma. Kulick is the founder, Chief Executive Officer, and principal of Vesta Holdings and Asset Holder. Kulick is also the founder and Chief Executive Officer of Vesta Capital, LLC and Vesta Realty, LLC. Vesta Capital, LLC is a fully integrated real estate investment firm specializing in the acquisition and renovation of multifamily communities across Arkansas, Kansas, and Oklahoma. Vesta Realty, LLC is a wholly owned subsidiary of Vesta Capital and is a property management company that ensures operational control and real-time monitoring of Vesta Capital's property

RESPONSE TO PARAGRAPH NO. 11:

YSA lacks information sufficient to admit or deny the allegations in this paragraph and on that basis denies the same.

PARAGRAPH NO. 12:

> YSA is a hard money lender based out of Miami, Florida, and led by a notorious felon, Efraim Diveroli, who was convicted for conspiring to defraud the United States government out of hundreds of millions of dollars by misrepresenting the source of arms and ammunition.

RESPONSE TO PARAGRAPH NO. 12:

YSA admits that it made hard money loans to Plaintiffs at their request and that Efraim Diveroli is its principal and that he was convicted of a felony more than a decade ago.

PARAGRAPH NO. 13:

> Pursuant to the needs of the Vesta entities, starting in October 2024, Plaintiffs and other entities owned and controlled by Kulick entered several loan transactions with YSA. The interest rates on these loans started at an extremely high annual rate of 100% and spiraled into ever excessive rates, topping out at an eye-popping and exploitative 7,000% per annum in July 2025.

RESPONSE TO PARAGRAPH NO. 13:

YSA admits that it provided funds to Kulick based on repayment terms proposed by Plaintiffs on numerous occasions between October 2024 and July 2025.

PARAGRAPH NO. 14:

> In total, Kulick and his entities borrowed $7,338,166.66 in principal from YSA. Kulick and his entities have repaid YSA $8,188,750.00.

RESPONSE TO PARAGRAPH NO. 14:

Denied. YSA loaned Plaintiffs more than $7.8 million in principal.

PARAGRAPH NO. 15:

> As part of the loan transactions, Kulick's entities, including the other Plaintiffs Vesta Holdings and Asset Holder, executed Collateral Pledge and Security Agreements in favor of YSA, all of which are essentially identical. Additionally, Kulick executed a Guaranty and ROFO (Right of First Offer) for each of the transactions, all of which were also essentially identical.

RESPONSE TO PARAGRAPH NO. 15:

Admitted. YSA refers the Court to the Collateral Pledge and Security Agreements and Guaranty and Right of First Offer for a complete and accurate description of their contents.

PARAGRAPH NO. 16:

> The Collateral Pledge and Security Agreements (the "February CPSA," attached hereto as Exhibit B) and Guaranty and ROFO (the "February Guaranty," attached hereto as Exhibit C) upon which YSA purports to rely on in recording the Second Mortgages are from a loan transaction made as of February 18, 2025. To secure repayment of the loan, the February CPSA collateralized the limited liability company interests held by Asset Holder and Vesta Holdings in seventeen Delaware limited liability companies: Capitol on 28th Investors, LLC; Remington Ranch Investors, LLC; Copperfield Investors, LLC; Putnam Investors, LLC; Woodscape Investors, LLC; Barcelona Best Living, LLC; Riverpark Best Living Investors, LLC; Montgomery Vesta Investors, LLC; Fairfax Holding Company, LLC; OKC3 Investors, LLC; Eton Investor, LLC; Eaton Place Investors, LLC; W.O. Holding Co., LLC; Regency Holdings, LLC; Woodland Manor Holdings, LLC; 727-Classes Best Living Investors, LLC; and Muntage Vesta Investors, LLC (the "Intermediate Holding LLCs").

RESPONSE TO PARAGRAPH NO. 16:

YSA admits that the loan documents pledge collateral. YSA respectfully

refers the Court to the documents for a complete and accurate description of their contents.

PARAGRAPH NO. 17:

> The Intermediate Holding LLCs have fractional beneficial interests in some but not all the Title Owners, which are defined below. All but one of the Intermediate Holding LLCs, Barcelona Best Living, LLC, hold their beneficial interests in a Title Owner through one or more additional levels of holding companies.

RESPONSE TO PARAGRAPH NO. 17:

YSA lacks information sufficient to admit or deny the allegations in this paragraph and on that basis denies the same.

PARAGRAPH NO. 18:

> The February CPSA contains a Power of Attorney clause at Section 4.6, which provides as follows:
>
> [Asset Holder] and [Vesta Holdings] each appoint [Defendant] as its/his/her/their attorney-in-fact with full power in [Asset Holder's] and [Vesta Holdings'] name and behalf to do every act that [Asset Holder] and [Vesta Holdings] are obligated to do or may be required to do hereunder or to do all other things which [Defendant] is permitted to do under this Agreement or any other Loan Documents or are necessary to carry out this Agreement or the other Loan Documents; however, nothing in this section shall be construed to obligate [Defendant] to take any action hereunder. Through exercise of this irrevocable power of attorney, [Defendant] may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to [Defendant]. This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither [Defendant] nor any of its officers, managers, employees or agents of [Defendant] will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted

> from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, [Defendant] shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

RESPONSE TO PARAGRAPH NO. 18:

YSA admits that the CPSA contains a Power of Attorney clause, and the YSA respectfully refers the Court to the loan documents for a complete and accurate description of their contents.

PARAGRAPH NO. 19:

> The February CPSA also contains a Joinder, titled "Joinder of Borrowed-Affiliated Entities," which provides:
>
> The undersigned [Kulick], as manager, member or other authorized person of any and all Guarantor Entities and any other entities [] which the undersigned does now own or control or may herein after own or control during the term of that certain [CPSA] hereby agrees to jointly and severally assume all obligations of Pledgor under the [CPSA] for all purposes thereof on the terms set forth therein and to be bound by the terms as fully as if the undersigned has personally and individually executed and delivered the [CPSA] as of the date thereof.

RESPONSE TO PARAGRAPH NO. 19:

YSA admits that there is a Joinder and respectfully refers the Court to the loan documents for a complete and accurate description of its contents.

PARAGRAPH NO. 20:

> The February Guaranty also contains a Power of Attorney clause at Section 7.h, which provides as follows:
>
> [Kulick] appoints [Defendant] as its/his/her attorney-in-fact with full power in [Kulick]'s name and behalf to do every act that [Kulick]is obligated to do or may be required to do hereunder; however, nothing in this section shall be construed to obligate [Defendant]to take any action hereunder. The power of attorney

> hereby created is a power coupled with an interest and shall be irrevocable. Through exercise of this irrevocable power of attorney, [Defendant] may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to [Defendant]. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither [Defendant] nor any of its officers, managers, employees or agents of [Defendant] will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, [Defendant] shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

RESPONSE TO PARAGRAPH NO. 20:

YSA admits that there is a Power of Attorney clause in the Guaranty and respectfully refers the Court to the loan documents for a complete and accurate description of its contents.

PARAGRAPH NO. 21:

> On October 31, 2025, Defendant recorded second mortgages against at least twenty-five properties. *See* Exhibit A.

RESPONSE TO PARAGRAPH NO. 21:

Admitted.

PARAGRAPH NO. 22:

> The properties (hereafter "Properties") at issue in this case are multifamily apartment complexes located in Oklahoma and Kansas and owned by A-V 23 East Owner, LLC; 727 Lofts Best Living LLC; Barcelona Best Living LLC; Bryan Hill's Best Living LLC; TRDWind Capitol LLC; A-V Classen Owner LLC; Copperfield Apartments LP; Fairfax Best Living LLC; Lakeside Best Living LLC; Bartlesville Best Living LLC; Lofts at North Penn Best Living LLC; Montgomery Best Living LLC; Muntage Best Living LLC; One Eton

> Square LLC; Ridge Best Living LLC; Riverpark Best Living LLC; Shoreline's Best Living LLC; Springdale Village's Best Living, LLC; Summer Oaks Best Living, LLC; Ridge Best Living LLC; Jenk's Best Living LLC; A-V Village Creek Owner LLC; Villas at Midtown Best Living LLC; Woodland Manor's Best Living LLC; Woodland Oaks Best Living LLC; B & J Woodscape/Oklahoma City LLC; and Easton Best Living, LLC (together the "Title Owners").

RESPONSE TO PARAGRAPH NO. 22:

YSA admits that the properties at issue are multifamily complexes located in Oklahoma and Kansas. Defendant lacks information sufficient to admit or deny the remaining allegations in this paragraph and on that basis denies the same.

PARAGRAPH NO. 23:

> Even though the Title Owners, not Plaintiffs, are their owners, Defendant has purported to record these second mortgages against the Properties under the Power of Attorney clauses that, on their face, do not and cannot confer authority to mortgage the real property discussed herein.

RESPONSE TO PARAGRAPH NO. 23:

Denied.

PARAGRAPH NO. 24:

> Defendant also recorded a mortgage against Kulick's personal residence in Oklahoma City, Oklahoma even though the Guaranty he signed provides Defendant no such rights. A copy of the recorded mortgage against Kulick's personal residence is attached hereto as Exhibit D.

RESPONSE TO PARAGRAPH NO. 24:

YSA admits it recorded a mortgage against real property in Oklahoma City, Oklahoma. YSA denies any remaining allegations.

PARAGRAPH NO. 25:

> Following the recording of those second mortgages, on November 5, 2025, Defendant brought a civil action against Kulick and others, alleging breach of contract and unjust enrichment with respect to four of the loan transactions referenced herein. The civil action is *YSA Investments 1, LLC v. Marc Kulick, et al.*, Case No. N25C-10-309 KMM (Del. Super. Ct.).

RESPONSE TO PARAGRAPH NO. 25:

Admitted. YSA respectfully refers the Court to the complaint in *YSA Investments 1, LLC v. Marc Kulick, et al.*, Case No. N25C-10-309 KMM for a complete and accurate description of its contents.

PARAGRAPH NO. 26:

> Before and since the filing of that suit, Defendant, through Diveroli, has engaged in what can only be described as an extortion scheme. This includes, but is not limited to, threatening to file an Amended Complaint that would allege fraud against Mr. Kulick's wife, business partner, and even his attorneys (for providing advice to their client). Defendant has also threatened to send preservation letters to entities and persons for which it has no reason to believe has relevant information in this suit, including, for example, Mr. Kulick's personal rabbi. Such preservation notices would serve no other purpose than to embarrass and humiliate Mr. Kulick in the communities in which he belongs.

RESPONSE TO PARAGRAPH NO. 26:

Denied.

PARAGRAPH NO. 27:

> The alternative Defendant, through Diveroli, has provided Plaintiffs is perhaps even worse than its threats. Notwithstanding that it has been repaid its principal in full and more, Defendant has only offered to dismiss its suit and not proceed with its extortion scheme in exchange for payment of $20 million with the extreme default penalty of deeds-in-lieu of foreclosure for each of the Properties (which Plaintiffs are powerless to provide) and a confession of judgment of $850

> million. In the meantime, while waiting to be paid its extortive settlement, Defendant would maintain the unlawful second mortgages on the properties owed by the Title Owners and file additional second mortgages.

RESPONSE TO PARAGRAPH NO. 27:

YSA admits that it has engaged in conversations with Plaintiffs regarding potential settlement of YSA's claims, but denies Plaintiffs' characterization and publication of those settlement discussions. YSA denies all remaining allegations, if any.

PARAGRAPH NO. 28:

> On December 2, 2025, Defendant informed Plaintiffs that it would "limit" the amount owed to approximately $900 million dollars, despite having lent only $7 million over the last year and having received $8 million in repayments.

RESPONSE TO PARAGRAPH NO. 28:

Denied.

PARAGRAPH NO. 29:

> Defendant's extortion scheme is already causing significant harm Muntage Best Living LLC was under contract with Greenlite Holdings, LLC to sell the real property it owns. However, because the title underwriter indicated that the transaction would not be able to close absent satisfaction of Defendant's unlawful second mortgage, that transaction was unable to close.

RESPONSE TO PARAGRAPH NO. 29:

Denied.

PARAGRAPH NO. 30:

> Making this situation further intolerable for Plaintiffs is Defendant's $900 million payoff demand, an extortive and criminally usurious amount that

prevents Plaintiffs from satisfying the illegitimate second mortgages.

RESPONSE TO PARAGRAPH NO. 30:

Denied.

PARAGRAPH NO. 31:

As part of extracting themselves from what can only be characterized as a loan sharking scheme, Plaintiffs have been forced to file this suit for a declaratory judgment that the second mortgages are unlawful and unauthorized and for a mandatory injunction that they be cancelled or rescinded from the public records.

RESPONSE TO PARAGRAPH NO. 31:

Denied, except YSA admits that Plaintiffs filed this suit for declaratory judgment and for mandatory injunctive relief.

PARAGRAPH NO. 32:

This relief must be granted for several reasons. *First*, Defendant does not have any rights, secured or otherwise, with respect to the Title Owners or the Properties. The Power of Attorney under the February CPSA, which Defendant contends gives it the right to record the second mortgages, appoints Defendant as Plaintiffs' attorney-in-fact with respect to the "Collateral"—i.e., Asset Holder and Vesta Holdings' limited liability company interests in the Intermediate Holding LLCs. As the attorney-in-fact, Defendant is permitted to take "any action against any of the Collateral or any real or personal property owned by the Collateral."

RESPONSE TO PARAGRAPH NO. 32:

Denied.

PARAGRAPH NO. 33:

The Collateral—Asset Holder and Vesta Holding's limited liability company interests in the Intermediate Holding LLCs—does not own the Properties.

Indeed, the membership interests do not own anything. Some of the Title Owners—A-V 23 East Owner LLC, Lakeside Best Living LLC, Bartlesville Best Living LLC, Lofts at North Penn Best Living LLC, Shoreline's Best Living LLC, Ridge Best Living LLC, THRIVE Argenta Owner LLC, Jenk's Best Living LLC, A-V Village Creek Owner LLC, and Villas at Midtown Best Living, LLC—are not owned by any of the Intermediate Holding LLCs and do not otherwise have any connection to them. And even if the collateralized limited liability company interests could be stretched to encompass the entirety of the Intermediate Holding LLCs themselves, these entities own, only indirectly, a fractional interest in some of the Title Owners, which in turn own the Properties. Yet Defendant has recorded the second mortgages against the Properties owned by the Title Owners with which Defendant has no contractual privity and against which Defendant has no rights whatsoever. The Power of Attorney clause in the February Guaranty is narrower than the one contained in the February CPSA and similarly provides no rights to Defendant with respect to Title Owners, the Properties, or to Kulick's personal residence.

RESPONSE TO PARAGRAPH NO. 33:

Denied.

PARAGRAPH NO. 34:

The Joinder does not alter this analysis. The Joinder extends the Power of Attorney clauses to entities which Kulick individually owns or controls. But Kulick does not individually own or control any of the Title Owners such that the Joinder would give Defendant any rights to mortgage their properties. And even if the import of the Joinder was to make every Title Owner and holding company a Pledgor under the February CPSA, the Joinder, at most, provides Defendant with a secured interest in the Title Owners' limited liability company interests, which does not translate to a right to a secured interest in the Title Owners' assets. Under the CPSA, the "Collateral" in which Defendant has a security interest are limited liability company interests owned by the Pledgors. (Ex. B, CPSA § 1.1(a).) The limited liability company interests owned by the Pledgors (including, *arguendo*, those of the Title Owners) do not own the Properties or have any cognizable rights to the entities' assets under 6 Del. C. § 18-701.

RESPONSE TO PARAGRAPH NO. 34:

Denied. YSA respectfully refers the Court to the Joinder and Power of Attorney clauses for a complete and accurate description of their contents.

PARAGRAPH NO. 35:

> *Second*, even if the Power of Attorney clauses could be stretched so far as to include rights held by the Title Owners, under 6 Del. Code § 18-702(a), those rights necessarily would not include the control rights necessary to record the Second Mortgages on the Properties. This is because control rights inherent in a limited liability company interest may not be assigned absent a provision in the operating agreement of that limited liability company permitting such an assignment or, alternatively, an affirmative vote or written consent of all members of the LLC permitting such an assignment. None of the operating agreements of the Intermediate Holding LLCs or the Title Owners contain such a right, and Defendant did not receive an affirmative vote or written consent of all members of any of the entities permitting such an assignment. Therefore, the Power of Attorney clause that purports to give Defendant rights to take actions on behalf of the collateralized "membership interests" in the Properties is of no legal effect.

RESPONSE TO PARAGRAPH NO. 35:

Denied. YSA respectfully refers the Court to the Power of Attorney clauses for a complete and accurate description of their contents.

PARAGRAPH NO. 36:

> *Third*, taking it even further, even if Defendant were to receive such control rights through Kulick, Asset Holder, and/or Vesta Holdings, none of their control rights contain the right to unilaterally mortgage the Properties held by the Title Owners. As attorney-in-fact, Defendant's rights can extend no further than those held by the principal for which it has been appointed an agent. Nor did Defendant have the apparent authority on behalf of the principals for purposes of the Second Mortgages (i.e., the Title Owners), as the Title Owners never manifested Kulick's authority to permit Defendant to record the second mortgages.

RESPONSE TO PARAGRAPH NO. 36:

Denied.

PARAGRAPH NO. 37:

> Defendant's recording of these second mortgages was therefore made without any authority, in violation of the loan documents, and plainly unlawful.

RESPONSE TO PARAGRAPH NO. 37:

Denied.

PARAGRAPH NO. 38:

> Defendant's recording of the second mortgages has harmed Plaintiffs' indirect economic interest in the Properties and has exposed them to vast potential liability as manager and/or operator of the Properties.

RESPONSE TO PARAGRAPH NO. 38:

Denied, except YSA admits that Plaintiffs are the manager(s) and/or operator(s) of the Properties.

**COUNT I: DECLARATORY JUDGMENT**

PARAGRAPH NO. 39:

> Plaintiffs re-allege and incorporate by reference the allegations preceding the first count of this complaint as if fully set forth herein.

RESPONSE TO PARAGRAPH NO. 39:

YSA incorporates by reference its responses to all of the preceding paragraphs as if set forth fully in this response.

PARAGRAPH NO. 40:

An actual controversy exists between Plaintiffs and Defendant regarding the validity of the second mortgages. This controversy is real, adverse and ripe for judicial determination.

RESPONSE TO PARAGRAPH NO. 40:

Denied.

PARAGRAPH NO. 41:

Defendant contends that it was within its rights to record the second mortgages while Plaintiff contends that this recording was unlawful, a breach of and gross overextension of the Power of Attorney clauses, part of an extortive scheme and that the second mortgages are invalid and should be cancelled or extinguished.

RESPONSE TO PARAGRAPH NO. 41:

YSA admits that it was within its rights to record the second mortgages and that Plaintiffs contend otherwise. YSA denies any remaining allegations.

PARAGRAPH NO. 42:

Therefore, Plaintiffs are entitled to a declaration that the second mortgages were recorded without right and in breach and violation of the Power of Attorney clauses, are void, of no legal effect, and not enforceable against the Properties.

RESPONSE TO PARAGRAPH NO. 42:

Denied.

PARAGRAPH NO. 43:

Plaintiffs re-allege and incorporate by reference the allegations preceding the first count of this complaint as if fully set forth herein.

RESPONSE TO PARAGRAPH NO. 43:

YSA incorporates by reference its responses to all of the preceding paragraphs as if set forth fully in this response.

PARAGRAPH NO. 44:

> The second mortgages on the Properties, even though invalid, remain of record and are causing irreparable harm to Plaintiffs.

RESPONSE TO PARAGRAPH NO. 44:

Denied.

PARAGRAPH NO. 45:

> Defendant's recording of the second mortgages was unlawful, a breach of and gross overextension of the Power of Attorney clauses, and part of an extortive scheme.

RESPONSE TO PARAGRAPH NO. 45:

Denied.

PARAGRAPH NO. 46:

> Defendant's recording of the second mortgages has scuttled the closing of one real estate transaction and threaten to obstruct many more. The second mortgages have caused, and will continue to cause, significant financial harm to Plaintiffs.

RESPONSE TO PARAGRAPH NO. 46:

Denied.

PARAGRAPH NO. 47:

> However, monetary damages alone will not cure Plaintiffs' harm because monetary remedies would not serve to remove the second mortgages from the

> public record. The second mortgages have clouded the Properties' title and have impacted the ability to alienate the Properties in the ordinary course of business.

RESPONSE TO PARAGRAPH NO. 47:

Denied.

PARAGRAPH NO. 48:

> Plaintiffs have no adequate remedy at law and are therefore entitled to a preliminary and permanent injunction directing Defendant to immediately execute and record withdrawals, cancellations, or releases of the invalid second mortgage.

RESPONSE TO PARAGRAPH NO. 48:

Denied.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Complaint fails to describe the claims against YSA with sufficient particularity to allow it to determine all of its defenses, and YSA therefore lacks knowledge or information sufficient to form a belief as to the existence and availability of additional affirmative defenses. YSA reserves the right to rely on any other defenses that may become available or may be disclosed by additional investigation or discovery during the proceedings in this case and reserve the right to amend this Answer and assert such other defenses, affirmative or otherwise.

### Second Affirmative Defense

This Court lacks jurisdiction to hear this dispute and Plaintiffs lack standing.

**Third Affirmative Defense**

Plaintiffs' claims are barred by the doctrines of waiver, estoppel and acquiescence. Specifically, Plaintiffs are estopped from contesting the YSA's ability to record second mortgages based on Kulick's statements and conduct, and Plaintiffs are further estopped from raising any arguments relating to purported usury, as Kulick proposed the loan terms and interest rates. Additionally, Plaintiffs' Complaint fails to allege the necessary elements of gross negligence or willful misconduct and, thus, this action cannot stand.

**Fourth Affirmative Defense**

Plaintiffs' claims are barred by the doctrine of unclean hands and fraudulent inducement. Plaintiffs have failed to act equitably towards YSA by, *inter alia*, misrepresenting material facts and failing to meet their obligations under the loan documents. All of these false representations were made with Plaintiffs' knowledge of their falsehood, and with the intent to induce YSA to loan Plaintiffs millions of dollars. YSA reasonably relied on Plaintiffs misrepresentations and falsified documents and has suffered damage as a result.

**Fifth Affirmative Defense**

In the alternative, without conceding any defect in the loan documents or recorded mortgaged, if the Court does not agree with YSA's interpretation of the loan documents and the parties intent behind them, the recorded mortgages are

enforceable as equitable mortgages and/or equitable liens under Delaware law.

**Sixth Affirmative Defense**

Plaintiffs possessed the actual or apparent authority to grant YSA the right to record mortgages against the subject Properties.

**Seventh Affirmative Defense**

Plaintiffs are not entitled to injunctive relief because they cannot establish irreparable harm given the existence of YSA's equitable interests and given that Plaintiffs' alleged injuries are fully compensable at law.

**Eighth Affirmative Defense**

Plaintiffs are the alter egos of each other and are further the alter egos of the various entities identified in Plaintiffs' Complaint as the "Title Owners" and "Intermediate Holding LLCs." Therefore, the Title Owners and Intermediate Holding LLCs are not legally distinct entities from Plaintiff Kulick and, as such, all Title Owners and Intermediate Holding LLCs are liable under the loan documents.

**Ninth Affirmative Defense**

Plaintiffs are not entitled to affirmative equitable or mandatory injunctive relief, and the Complaint fails to state a claim upon which relief can be granted, because Plaintiffs' claims fail based on YSA's rights under the loan documents at issue in this action.

**WHEREFORE**, YSA respectfully requests that the Court enter an order:

a) Dismissing the Complaint, with prejudice;

b) Affirming the validity of the recorded second mortgages;

c) Awarding YSA its costs, including reasonable attorneys' fees; and

d) Awarding such other relief as the Court deems just and proper.

## COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

Counterclaimant/Third-Party Plaintiff YSA Investments 1, LLC ("YSA"), by and through undersigned counsel, hereby submits this Counterclaim against Counterdefendants Marc Kulick and Vesta Holdings, LLC, and brings this Third-Party Complaint against Bartlesville Best Living, LLC; Shoreline's Best Living, LLC; Springdale Village TIC 1, LLC; Springdale Village TIC 2, LLC; Springdale Village TIC 3, LLC; Springdale Village's Best Living, LLC; A-V 23 East Owners, LLC; A-V Classen Owners, LLC; A-V Village Creek Owners, LLC; Auerbach-Vesta, LLC; Barcelona Best Living, LLC; Bryan Hills Best Living, LLC; Eaton Place TIC 1 LLC; Fairfax Holding Company, LLC; Lakeside Best Living LLC; Lofts at North Penn Best Living LLC;; Montgomery Apartment Holdings, LLC; Montgomery Best Living, LLC; Muntage Best Living, LLC; NAE Canopy Apartments, LLC; OKC3 Investors LLC; One Eton TIC 1 LLC; Remington Ranch Best Living LLC; Ridge Best Living Investors LLC; Ridge Best Living, LLC; River Walk Best Living, LLC; Riverpark Best Living, LLC; Summer Oaks Best Living LLC; Tuscan Village Best Living LLC; Vesta-Seminole Ridge LLC; Villas at

Midtown Best Living LLC; W.M. Best Living Owner, LLC; W.O. Sole Member LLC; Woodland Oaks Best Living LLC; Jenks Best Living LLC; Louis Investments LLC; LS Apartment Sponsor LLC; River Walk Sponsor LLC; Riverpark Best Living Sponsor LLC; Seminole Ridge Apartments Holdings LLC; Seminole Ridge Sponsor LLC; Tuscany Village Sponsor LLC; Vesta Holdings, LLC; 206 Queen Anne Club LLC; B&J Woodscape / Oklahoma City, LLC; and Copperfield Apartments, LP and all entities that Kulick owns or manages that are implicated in the allegations as follows:

**Parties, Jurisdiction, and Venue**

1. YSA is a Delaware limited liability company.

2. Marc Kulick is an individual residing in Oklahoma.

3. Vesta Holdings, LLC is an Oklahoma limited liability company.

4. Third-Party Defendant BARTLESVILLE BEST LIVING, LLC is a limited liability company formed and organized under the laws of Oklahoma.

5. Third-Party Defendant SHORELINE'S BEST LIVING, LLC is a limited liability company formed and organized under the laws of Delaware.

6. Third-Party Defendant SPRINGDALE VILLAGE TIC 1, LLC is a limited liability company formed and organized under the laws of Delaware.

7. Third-Party Defendant SPRINGDALE VILLAGE TIC 2, LLC is a limited liability company formed and organized under the laws of Delaware.

8. Third-Party Defendant SPRINGDALE VILLAGE TIC 3, LLC is a limited liability company formed and organized under the laws of Delaware.

9. Third-Party Defendant SPRINGDALE VILLAGE'S BEST LIVING, LLC is a limited liability company formed and organized under the laws of Delaware.

10. Third-Party Defendant A-V 23 EAST OWNERS, LLC is a limited liability company formed and organized under the laws of Delaware.

11. Third-Party Defendant A-V CLASSEN OWNER, LLC is a limited liability company formed and organized under the laws of Delaware.

12. Third-Party Defendant A-V VILLAGE CREEK OWNER, LLC is a limited liability company formed and organized under the laws of Delaware.

13. Third-Party Defendant AUERBACH-VESTA, LLC is a limited liability company formed and organized under the laws of Delaware.

14. Third-Party Defendant BARCELONA BEST LIVING, LLC is a limited liability company formed and organized under the laws of Delaware.

15. Third-Party Defendant BRYAN HILLS BEST LIVING, LLC is a limited liability company formed and organized under the laws of Delaware.

16. Third-Party Defendant EATON PLACE TIC 1 LLC is a limited liability company formed and organized under the laws of Delaware.

17. Third-Party Defendant FAIRFAX HOLDING COMPANY LLC is a

limited liability company formed and organized under the laws of Delaware.

18. Third-Party Defendant LAKESIDE BEST LIVING LLC is a limited liability company formed and organized under the laws of Delaware.

19. Third-Party Defendant LOFTS AT NORTH PENN BEST LIVING LLC is a limited liability company formed and organized under the laws of Delaware.

20. Third-Party Defendant MONTGOMERY APARTMENT HOLDINGS, LLC is a limited liability company formed and organized under the laws of Delaware.

21. Third-Party Defendant MONTGOMERY BEST LIVING, LLC is a limited liability company formed and organized under the laws of Delaware.

22. Third-Party Defendant MUNTAGE BEST LIVING, LLC is a limited liability company formed and organized under the laws of Delaware.

23. Third-Party Defendant NAE CANOPY APARTMENTS, LLC is a limited liability company formed and organized under the laws of Delaware.

24. Third-Party Defendant OKC3 INVESTORS LLC is a limited liability company formed and organized under the laws of Delaware.

25. Third-Party Defendant ONE ETON TIC 1 LLC is a limited liability company formed and organized under the laws of Delaware.

26. Third-Party Defendant REMINGTON RANCH BEST LIVING LLC is

a limited liability company formed and organized under the laws of Delaware.

27. Third-Party Defendant RIDGE BEST LIVING INVESTORS LLC is a limited liability company formed and organized under the laws of Delaware.

28. Third-Party Defendant RIDGE BEST LIVING, LLC is a limited liability company formed and organized under the laws of Delaware.

29. Third-Party Defendant RIVER WALK BEST LIVING, LLC is a limited liability company formed and organized under the laws of Delaware.

30. Third-Party Defendant RIVERPARK BEST LIVING, LLC is a limited liability company formed and organized under the laws of Delaware.

31. Third-Party Defendant SUMMER OAKS BEST LIVING LLC is a limited liability company formed and organized under the laws of Delaware.

32. Third-Party Defendant TUSCANY VILLAGE BEST LIVING LLC is a limited liability company formed and organized under the laws of Delaware.

33. Third-Party Defendant VESTA-SEMINOLE RIDGE LLC is a limited liability company formed and organized under the laws of Delaware.

34. Third-Party Defendant VILLAS AT MIDTOWN BEST LIVING LLC is a limited liability company formed and organized under the laws of Delaware.

35. Third-Party Defendant W.M. BEST LIVING OWNER, LLC is a limited liability company formed and organized under the laws of Delaware.

36. Third-Party Defendant W.O. SOLE MEMBER LLC is a limited

liability company formed and organized under the laws of Delaware.

37. Third-Party Defendant WOODLAND OAKS BEST LIVING LLC is a limited liability company formed and organized under the laws of Delaware.

38. Third-Party Defendant JENKS BEST LIVING LLC is a limited liability company formed and organized under the laws of Kansas.

39. Third-Party Defendant LOUIS INVESTMENTS LLC is a limited liability company formed and organized under the laws of Kansas.

40. Third-Party Defendant LS APARTMENT SPONSOR LLC is a limited liability company formed and organized under the laws of Kansas.

41. Third-Party Defendant RIVER WALK SPONSOR LLC is a limited liability company formed and organized under the laws of Kansas.

42. Third-Party Defendant RIVERPARK BEST LIVING INVESTORS LLC is a limited liability company formed and organized under the laws of Kansas.

43. Third-Party Defendant SEMINOLE RIDGE APARTMENTS HOLDINGS LLC is a limited liability company formed and organized under the laws of Kansas.

44. Third-Party Defendant SEMINOLE RIDGE SPONSOR LLC is a limited liability company formed and organized under the laws of Kansas.

45. Third-Party Defendant TUSCANY VILLAGE SPONSOR LLC is a limited liability company formed and organized under the laws of Kansas.

46. Third-Party Defendant 206 QUEEN ANNE CLUB LLC is a limited liability company formed and organized under the laws of Maryland.

47. Third-Party Defendant B&J WOODSCAPE / OKLAHOMA CITY, LLC is a limited liability company formed and organized under the laws of Oklahoma.

48. Third-Party Defendant COPPERFIELD APARTMENTS, LP is a limited partnership formed and organized under the laws of Oklahoma.

49. The true names and capacities, whether individual, corporate, associate, partnership, or otherwise, of the Defendants herein designated as Does 1-100 and Roe Entities 1-100 are unknown to YSA, who therefore sues said Defendants by such fictitious names. YSA will seek leave of the Court to insert the true names and capacities of such Defendants when the same have been ascertained.

50. This Court has subject matter jurisdiction pursuant to 10 Del. C. § 341, as YSA seeks equitable remedies in the form of a declaratory judgment, an order for specific performance, and the imposition of a constructive trust.

51. Further, jurisdiction and venue are proper because the documents governing the loans at issue in this case select the State of Delaware as the governing forum for all disputes arising thereunder.

## General Allegations

***Kulick Borrows Millions of Dollars from YSA and Defaults***

52. Between October 2024 and July 2025, Kulick requested and obtained a dozen short-term loans from YSA, ostensibly for the benefit of various multifamily apartment complexes that Kulick owns and manages.

53. In connection with each loan, Kulick executed a Promissory Note, a Collateral Pledge and Security Agreement ("CPSA"), a Personal Guaranty and Right of First Offer (the "Guaranty"), and a Confession of Judgment (collectively, the "Loan Documents"). The Loan Documents are virtually identical for all loans issued, with the only material differences being the amounts, rates, dates, repayment schedules, and in some cases, the particular Kulick-entity that was Borrower or Pledgor.

54. Kulick and his attorney, A.J. Jindal, prepared the Loan Document templates and provided them to YSA.

55. For each of the loans, Kulick solicited YSA's funds by asking for a certain amount to be wired to an affiliated entity's bank account and offering to repay a substantially higher amount at a later date. Based on the terms proposed by Kulick, YSA would reverse engineer the effective interest rate and the Loan Documents would be prepared to reflect the terms proposed by Kulick.

56. Kulick would frequently miss payment deadlines and request

extensions from YSA. Each time Kulick requested an extension, he would offer to pay an additional amount of money to compensate YSA for the delay.

57. Kulick and his entities fell into formal Default beginning on May 19, 2025, when Kulick failed to make a balloon principal payment of $1,500,000.00 for a loan issued on February 18, 2025 (the "February Loan").

58. Despite being in Default on the February Loan, in mid-June, Kulick begged YSA to provide him with additional funds so he would not default on a repayment agreement with the IRS for his personal tax liability.

59. When YSA still hesitated to fund additional loans, on June 16, 2025, Kulick represented to YSA that its loans were more secured and collateralized than any other loans he had ever obtained and that if Kulick defaulted on future loans, YSA could take over all equity in the properties.

60. Based on those representations, YSA issued approximately $1,000,000.00 in additional loans on June 19, 2025, July 16, 2025, and July 31, 2025, each with interest that Kulick agreed would be compounded daily.

61. Kulick did not repay any of those loans.

62. In total, Kulick and his related entities failed to repay four loans dated: February 18, 2025; June 19, 2025; July 16, 2025; and July 31, 2025 (collectively the "Defaulted Loans").

***The Loan Documents and Joinder of All Affiliated Entities***

63. Kulick executed a set of Loan Documents to obtain each of the Defaulted Loans. The terms contained in the Loan Documents for each of the Defaulted Loans are identical in all material respects.

64. Under each promissory note, Kulick represented and warranted that he and the borrowing entity were lawfully able to enter into the contemplated transactions and that all obligations and promises contained within the Loan Documents had "been authorized by all necessary company action and do not and will not contravene Borrower's formation or constitutional documents, violate any provision of law or result in a breach of or default under any other agreement to which Borrower is a party." *See* Note, ¶ 9.2.

65. Under each CPSA, Kulick, Vesta Holdings, and the borrower entity agreed to "pledge, grant, and assign to Lender a security interest in and lien upon the Collateral" as defined in the CPSA. *See* CPSA ¶ 1.1(a).

66. The Collateral is defined expansively and includes all right, title, and interest in membership interests and capital account contribution amounts belonging to the Borrower and Pledgor and *inter alia*:

a. Any and all other interests in any Entity owned by Borrower or Pledgor, whether owned at the time the Loan Documents were executed or thereafter acquired;

b. All claims that the Borrower or a Pledgor has against any Entity or its property, whether existing at the time the Loan Documents were executed or thereafter acquired; and

c. All rights conferred to Borrower or a Pledgor under any organizational documents or agreement, "including all voting and consent rights." *Id.*

67. Additionally, the CPSA expressly provides that YSA's "security interest shall attach automatically to any interests in any entity that Borrower or Pledgor, as applicable, may at any time in the future acquire without any further action by Borrower or Lender." *Id.* at ¶ 1.2.

68. The CPSA further defines the term "Guarantor Entity" as being "any entity (i) directly or indirectly controlled or managed by [Kulick] or (ii) directly or indirectly owned by [Kulick] in whole or in part with respect to which [Kulick] receives notices in the ordinary course of business." *Id.* at ¶ 3.5.

69. The final page of the CPSA is a "Joinder of Borrower-Affiliated Entities," (the "Joinder") which Kulick personally executed as an express condition precedent to YSA agreeing to fund the Defaulted Loans.

70. Kulick executed the Joinder on behalf of "any and all Guarantor Entities and any other entities in which the undersigned does now own or control or may herein after [*sic*] own or control during the term of [the CPSA]."

71. The Joinder states that all entities that Kulick owns or controls agreed

to "jointly and severally assume all obligations of Pledgor under [the CPSA] for all purposes thereof on the terms set forth therein and to be bound by the terms of the [CPSA] as fully as if the undersigned had personally and individually executed and delivered the [CPSA]."

72. Accordingly, pursuant to the Joinder, every Guarantor Entity—which is to say any entity that Kulick directly or indirectly owns, controls, or manages—is properly considered a Pledgor and signatory to the CPSA.

73. In addition, the CPSA contains a Power of Attorney clause that appoints YSA as attorney-in-fact for the Borrower and the Pledgors. This provision authorizes YSA to act "with full power in Borrower's and Pledgor's name and behalf to do every act . . . necessary to carry out this Agreement or the other Loan Documents." CPSA ¶ 4.5.

74. This clause further states that "[t]hrough exercise of this irrevocable power of attorney, [YSA] may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to [YSA]." *Id.*

75. That Power of Attorney clause is reiterated in the Guaranty, under which Kulick personally appointed YSA as his attorney-in-fact and authorized YSA to act "with full power in Guarantor's name and behalf to do every act that [Kulick]

is obligated to do or may be required to do hereunder," including by "filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender." Guaranty, ¶ 7(h).

76. Finally, the CPSA expressly acknowledges that YSA is authorized to: "without notice or demand . . . exercise any rights under the UCC, rights and remedies of Lender under this Agreement or otherwise, including but not limited to taking any action against the Collateral or any of the Collateral's real or personal property." CPSA ¶ 5.2.

***Kulick's Fiduciary Obligation to YSA, and His Breach of that Duty***

77. Kulick is personally obligated to ensure repayment of the Defaulted Loans under the Guaranty that he signed with each. *See, e.g.*, Guaranty (KULICK020592–KULICK020599).

78. As part of this obligation, the Guaranty requires that Kulick act in a fiduciary capacity for the duration of any default. Specifically, Paragraph 2(g) of the Guaranty provides, in relevant part, that "[u]pon any notice by Lender to the Company or Pledgor of any default under the Note or Agreement, Guarantor shall enforce any of their claims as a trustee for Lender, and shall cause any receipts to be paid over to Lender on account of the Note and Agreement. . . ." *Id.*

79. Thus, upon notice by YSA of Vesta Holdings' default, Kulick has an obligation under Paragraph 2(g) of the Guaranty to enforce Vesta Holdings' claims

as trustee for YSA and to pay any amounts recovered to YSA. *Id.*

80. Kulick provided sworn testimony that Vesta Holdings has made loans totaling approximately $37 million to the Kulick-related entities that own and manage the various real properties under Kulick's control. *See* Kulick Deposition Transcript, Day 1, at 165:14–166:5.

81. Under the express terms of the CPSA, Vesta Holdings' claims for repayment of that $37 million constitutes collateral that was pledged to YSA to secure repayment of the Defaulted Loans. *See* CPSA ¶ 1.1(a)(iv).

82. Kulick also provided sworn testimony that he is owed "over $22 million personally" from various entities under his control. Kulick Deposition Transcript, Day 1, at 89:2–5.

83. According to Kulick's sworn deposition testimony, these loans have no maturity date and are payable on demand. *Id.* at 172:16–173:3.

84. YSA notified Vesta Holdings through Kulick that Vesta Holdings is in default on the loans at issue. *See* YSA_00000071–YSA_00000072. Kulick repeatedly acknowledged that the loans were in default throughout the parties' relationship, and reconfirmed that he understood he was in serious, uncured default as of September 18, 2025. *See* YSA_00000115.

85. Therefore, under Paragraph 2(g) of the Guaranty, Kulick is required to enforce the claims that he and Vesta Holdings have against his related entities as

YSA's trustee and "cause any receipts to be paid over to Lender on account of the Note and Agreement."

86. Kulick has failed to do so.

87. Instead, between September 26, 2025 and October 20, 2025, Kulick sold approximately $13,400,000 of the loans owed to Vesta Holdings to third-party buyers for a mere $3,415,385—amounting to a nearly 75% discount. *See, e.g.*, KULICK1501566–1501575; KULICK1541535–1541452; KULICK1914566–1914576; KULICK1934943–1934950 (various purported Loan Purchase and Sale Agreements, "LPSAs").

88. Upon information and belief, the buyers listed on the LPSAs are Kulick's partners, relatives, or others with close personal contacts to Kulick and/or entities owned by those people, to the point that the LPSAs evidence purported sales to insiders.

89. Kulick continues to solicit buyers to purchase Vesta Holdings' claims against Kulick's related entities at a discount to obtain cash for himself. *See, e.g.*, KULICK022585–KULICK022589; KULICK0037528; KULICK0038428; *see also* Kulick Deposition Transcript, Day 1, at 221:15–222:13 (admitting to pledging future rents/receivables to multiple different lenders).

90. YSA does not have an adequate remedy at law.

91. YSA is being irreparably harmed as a result of Kulick's actions. YSA's

ability to recover on the $37 million in Vesta Loans is in jeopardy. Kulick has and continues to dissipate funds from the Vesta Loans to himself and others, rather than holding those funds in trust for YSA, as required by the Guaranty. *See, e.g.*, Kara Thomas Deposition Transcript, Day 1, at 98:17-99:23; 151:16-152:13 (stating that Kulick directed funds from Vesta Holdings to be used to pay his personal mortgage, personal vehicle payment, and the rent of a former employee named "Milly").

92. More egregiously, Kulick has purported to sell more than $13 million of the Vesta Loans without notice or approval from YSA, and Kulick has not remitted any of the proceeds from such sales to YSA, despite his clear obligation to do so under Paragraph 2(g) of the Guaranty.

93. Kulick also appears to be commingling funds among his dozens of affiliates, and he is using their cash to pay his own lavish personal expenses. Immediate action has become necessary to ensure that the proceeds of the Vesta Loans and the Kulick Loans are available to be paid to YSA once YSA succeeds on its claim for specific performance under the Guaranty. *See, e.g.*, KULICK009775–KULICK009796 (Vesta Holdings July 31, 2025 Checking Account Statement, showing deposits and withdrawals exceeding $27 million, primarily from internal transfers).

***YSA's Efforts to Preserve the Value of Pledged Collateral***

94. Kulick's actions have resulted in a devaluation of the collateral securing

repayment of the Defaulted Loans.

95. Additionally, Kulick has purported to transfer large portions of the collateral to third parties without YSA's knowledge or approval.

96. Upon information and belief, multiple senior mortgage lenders have initiated foreclosure proceedings and/or requested appointment of a receiver over specific properties due to Kulick's extensive financial misconduct. Although a receivership would unequivocally benefit the properties being foreclosed upon, Kulick is instead expending his limited resources to resist the appointment of a receiver because a receiver would cut off Kulick's ability to take money from his properties at will.

97. As a result of Kulick's ongoing misdeeds and self-dealing, YSA has been forced to exercise its rights under Title 9 of the Uniform Commercial Code ("UCC"), codified in Title 6 of the Delaware Code, to take possession of and operate the collateral "for the purpose of preserving the collateral or its value." 6 Del. C. § 9-207(b)(4)(A); *see also* 6 Del. C. § 9-609(a)(1) (allowing a secured creditor to take possession of collateral after default).

98. To accomplish this necessary collateral preservation, YSA has taken ownership of and control over many of the Guarantor Entities, evidenced by UCC filings which have been recorded in their respective states.

99. Specifically, YSA has taken ownership of the following entities to

preserve its collateral: Bartlesville Best Living, LLC; Shoreline's Best Living, LLC; Springdale Village TIC 1, LLC; Springdale Village TIC 2, LLC; Springdale Village TIC 3, LLC; Springdale Village's Best Living, LLC; A-V 23 East Owners, LLC; A-V Classen Owners, LLC; A-V Village Creek Owners, LLC; Auerbach-Vesta, LLC; Barcelona Best Living, LLC; Bryan Hills Best Living, LLC; Eaton Place TIC 1 LLC; Fairfax Holding Company, LLC; Lakeside Best Living LLC; Lofts at North Penn Best Living LLC;; Montgomery Apartment Holdings, LLC; Montgomery Best Living, LLC; Muntage Best Living, LLC; NAE Canopy Apartments, LLC; OKC3 Investors LLC; One Eton TIC 1 LLC; Remington Ranch Best Living LLC; Ridge Best Living Investors LLC; Ridge Best Living, LLC; River Walk Best Living, LLC; Riverpark Best Living, LLC; Summer Oaks Best Living LLC; Tuscan Village Best Living LLC; Vesta-Seminole Ridge LLC; Villas at Midtown Best Living LLC; W.M. Best Living Owner, LLC; W.O. Sole Member LLC; Woodland Oaks Best Living LLC; Jenks Best Living LLC; Louis Investments LLC; LS Apartment Sponsor LLC; River Walk Sponsor LLC; Riverpark Best Living Sponsor LLC; Seminole Ridge Apartments Holdings LLC; Seminole Ridge Sponsor LLC; Tuscany Village Sponsor LLC; Vesta Holdings, LLC; 206 Queen Anne Club LLC; B&J Woodscape / Oklahoma City, LLC; and Copperfield Apartments, LP (collectively the "Collateral Entities"). As owner of the Collateral Entities, YSA will take all steps that it deems reasonable and necessary to preserve the value of any assets owned by

the Collateral Entities, including by making assignments of rents where appropriate.

100. These actions are lawful under the UCC and expressly authorized under the terms of the CPSA and the Guaranty. *See* CPSA ¶¶ 4.5, 5.2; Guaranty 7(h).

101. Each of the Collateral Entities are entities that Kulick pledged as an additional Pledgor of the CPSA pursuant to the Joinder.

102. Moreover, Kulick has held himself out to be the owner of the Collateral Entities to YSA and many other lenders. *See, e.g.*, KULICK022405 (Kulick holding himself out as owner of many Collateral Entities to obtain a loan from TVT Capital on April 21, 2025); KULICK021288-KULICK021307 (Kulick signing as owner of many Collateral Entities to obtain a loan from Coldwater Capital LLC on April 24, 2025); KULICK021127-KULICK021161 (Kulick signing as owner of 43 entities, including many Collateral Entities, to obtain a loan from BH Capital Group on June 10, 2025).

103. Despite his persistent representations that he is the owner of the Collateral Entities, and despite the clear language of the Loan Documents, Kulick nonetheless contests YSA's ability to seize pledged collateral, assign the rents generated by the Collateral Entities, or act as his attorney-in-fact.

104. Therefore, YSA requires a judicial declaration that it lawfully owns and controls the Collateral Entities pursuant to the UCC and the Loan Documents in order to ensure that nonparties to this action (to wit: banks, financial institutions,

other courts, and service providers) recognize YSA's legal authority to make decisions for those entities until the Defaulted Loans have been repaid in full.

105. Further, a judicial declaration is necessary to ensure that Kulick does not continue to hold himself out to be the manager of any such entities for the purpose of continuing to encumber or dissipate the collateral.

**FIRST CAUSE OF ACTION**
**(Declaratory Judgment re: UCC against all Counterdefendants and Third-Party Defendants)**

106. YSA repeats and realleges the foregoing paragraphs as if fully set forth herein.

107. YSA is a secured creditor of Kulick and his related entities under the Loan Documents.

108. Kulick and his related entities fell into default on the Defaulted Loans in May 2025. That default continues to this day.

109. Under Title 9 of the UCC, codified in Title 6 of the Delaware Code, a secured creditor is allowed to take possession of collateral after default. *See* 6 Del. C. § 9-609(a)(1).

110. 6 Del. C. § 9-207(b)(4)(A) further authorizes a secured creditor to take possession of and operate the collateral "for the purpose of preserving the collateral or its value."

111. As set forth in the Loan Documents, part of the collateral that Kulick

and his related entities pledged were membership interests and control rights over every entity (i) directly or indirectly controlled or managed by Kulick or (ii) directly or indirectly owned by Kulick, in whole or in part. YSA identified those entities as the Collateral Entities, defined above.

112. YSA has taken ownership, possession, and operational control of the Collateral Entities and executed or will execute an assignment of rents to preserve them from further devaluation at Kulick's hands.

113. Despite YSA's clear authority to do so under the CPSA, Joinder, and Guaranty, Kulick has contested YSA's legal authority to exercise its rights under 6 Del. C. §§ 9-207, 9-609, and other provisions of the UCC or applicable law. Thus, a live, justiciable controversy exists.

114. YSA requires a judicial declaration that it has lawful ownership of and control over the Collateral Entities until the Defaulted Loans are fully repaid.

## SECOND CAUSE OF ACTION
**(Breach of Fiduciary Duty against Marc Kulick)**

115. YSA repeats and realleges the foregoing paragraphs as if fully set forth herein.

116. The Guaranty is a valid and enforceable contract.

117. Paragraph 2(g) of the Guaranty imposes a fiduciary obligation on Kulick to serve as YSA's trustee after an "Event of Default" occurs and enforce any

claims that he and Vesta Holdings have against Kulick's related entities (the third-party defendants herein) and remit the proceeds of such claims to YSA.

118. Pursuant to the terms of the Loan Documents, non-payment constitutes an Event of Default.

119. YSA has notified Kulick and his related entities that an Event of Default had occurred.

120. Kulick and his entities remain in persistent uncured default.

121. Despite that, Kulick is not enforcing his claims or Vesta Holdings' claims against any of his related entities.

122. Instead, Kulick has purportedly sold some of these claims to third parties at a cash discount and kept the proceeds of such sales for himself, as documented in multiple LPSAs.

123. Upon information and belief, Kulick continues to try and sell some or all of the Vesta Loans and/or Kulick Loans to third parties.

124. By failing to enforce these claims for YSA's benefit, by entering into LPSAs with third parties purportedly selling some of these claims, and by further attempting to sell these claims to third parties, Kulick has and continues to violate his fiduciary duties of care and loyalty to YSA.

125. Kulick's actions have not been taken in good faith, are not fair, and are the result of Kulick's willful misconduct.

126. Through the misconduct described above, Kulick has breached—and continues to breach—his fiduciary duties, causing damage to YSA for which there is no adequate remedy at law.

**THIRD CAUSE OF ACTION**
**(Specific Performance against Marc Kulick)**

127. YSA repeats and realleges the foregoing paragraphs as if fully set forth herein.

128. The Guaranty is a valid and enforceable contract.

129. YSA at all times has been ready, able, and willing to perform its obligations under the Guaranty and the other documents governing the loans at issue, and YSA in fact has performed them.

130. Kulick has failed to perform his obligations under the Guaranty.

131. The balance of equities tip in favor of requiring specific performance. YSA in good faith loaned significant amounts of money under the loans at issue and has not been repaid. There is cash that can be used to repay YSA's loans, and the Guaranty requires Kulick, as YSA's fiduciary, to seek to recover that cash and use it to repay YSA.

132. Instead, Kulick is attempting to sell loans belonging to himself and Vesta Holdings to third parties, when he should be enforcing those loans as YSA's trustee.

133. Upon information and belief, rather than calling the aforementioned

loans due and remitting their proceeds to YSA, Kulick is using that cash for his personal benefit and other improper purposes.

134. YSA has no adequate remedy at law for Kulick's ongoing breach of fiduciary duty. In addition, Kulick's ongoing dissipation of the funds that could be used to repay YSA presents a meaningful threat that any legal remedy here would be meaningless and that Kulick will effectively be judgment proof.

**FOURTH CAUSE OF ACTION**
**(Fraudulent Transfer under 6 Del. C. §§ 1304 – 1305)**

135. YSA repeats and realleges the foregoing paragraphs as if fully set forth herein.

136. YSA is a creditor of Kulick and his related entities by virtue of the Loan Documents containing the terms of the Defaulted Loans.

137. Kulick knew of his obligations relating to the Defaulted Loans beginning in May of 2025. Kulick admitted that he and his entities were in Default on September 18, 2025.

138. Despite this knowledge, between September 26 and October 20, 2025, Kulick sold approximately $13,400,000 of the loans owed to Vesta Holdings to third-party buyers for a mere $3,415,385—amounting to a nearly 75% discount. *See, e.g.*, KULICK1501566–1501575; KULICK1541535–1541452; KULICK1914566–1914576; KULICK1934943–1934950 (various purported Loan Purchase and Sale Agreements, "LPSAs").

139. Upon information and belief, the buyers listed on the LPSAs are properly considered insiders.

140. These purported sales occurred without YSA's knowledge or approval, and Kulick knowingly and deliberately concealed the existence of the LPSAs from YSA.

141. Kulick entered into each LPSA with the intent to hinder, delay, or defraud YSA and to prevent YSA from collecting amounts due under each of the Defaulted Loans.

142. Given that Kulick testified that the Vesta Loans and Kulick Loans were payable on demand, there was not a reasonably equivalent exchange for the sale of these loans in the LPSA.

143. Instead, the LPSAs simply provided a $10 million discount to insiders, while purporting to give them rights to claims that properly belong to YSA.

144. Each LPSA constitutes a fraudulent transfer under 6 Del. C. § 1304 and/or 6 Del. C. § 1305. Accordingly, each LPSA should be deemed void.

**FIFTH CAUSE OF ACTION**
**(Unjust Enrichment/Constructive Trust against all defendants)**

145. YSA repeats and realleges the foregoing paragraphs as if fully set forth herein.

146. Money that Kulick and Vesta Holdings have received from Kulick's other entities since YSA provided notice of default has not been paid to YSA, in

violation of Kulick's contractual and fiduciary obligations to YSA under Paragraph 2(g) of the Guaranty.

147. Upon information and belief, this money has been further transferred to Kulick himself, as well as to various related and unrelated third parties, identified here as Does 1–100 and Roes 1–100.

148. These parties have been enriched by the amounts they received, while YSA simultaneously has been impoverished by those amounts.

149. There is no justification for these parties to retain these amounts as they should have been recovered by Kulick as trustee and then paid to YSA.

150. In addition, Kulick's ongoing dissipation of the cash that could be used to repay YSA presents a meaningful threat that any legal remedy here would be meaningless.

151. Therefore, the Court should impose a constructive trust over such amounts.

**PRAYER FOR RELIEF**

WHEREFORE, YSA prays that judgment be entered in its favor and against the Counterdefendants, jointly and severally, on all counts as follows:

a) Finding and declaring that Kulick has breached his fiduciary duties;

b) Requiring Kulick to perform on his obligation under Paragraph 2(g) of the Guaranty, including, but not limited to, by immediately taking all necessary

steps to recover on the loans Kulick and Vesta Holdings made to the Doe and Roe third-party defendants;

c) Voiding the LPSAs for fraudulent transfer;

d) Finding and declaring that YSA's exercise of its rights under 6 Del. C. §§ 9-207 and 9-609 was proper and lawful, and that YSA is lawfully owner of and has control over the Collateral Entities until the Defaulted Loans are repaid in full;

e) Imposing a constructive trust over all amounts that Kulick and Vesta Holdings have received from related entities since the first event of default;

f) Preliminarily and permanently enjoining Kulick, the third-party defendants, and any other affiliate or individual they control, from removing any additional cash from those entities, until such time as Kulick complies with his fiduciary duty and recovers the $37 million in Vesta Holdings' loans and the $22 million in his personal loans for YSA's benefit.

g) Awarding YSA its costs and expenses incurred in enforcing its security interest under the Loan Documents, including the costs and reasonable attorneys' fees incurred in this litigation; and

h) Awarding such other relief as the Court deems just and proper.

**GREENBERG TRAURIG, LLP**

*/s/ Sarah R. Martin*
Sarah R. Martin (#5230)
Samuel L. Moultrie (#5979)
222 Delaware Avenue, Suite 1600
Wilmington, Delaware 19801
(302) 661-7000
Sarah.Martin@gtlaw.com
Moultries@gtlaw.com

*Attorneys for Defendant YSA Investments 1, LLC*

Of Counsel:

**GREENBERG TRAURIG, LLP**
Joel Tasca (admitted *pro hac vice*)
Kerry Kleiman (admitted *pro hac vice*)
10845 Griffith Peak Drive, suite 600
Las Vegas, Nevada 89135

DATED: February 11, 2026